**MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP**
(A Limited Liability Partnership Formed in Pennsylvania)
By:     Natalie D. Ramsey (*admitted pro hac vice*)
        John H. Lewis, Jr. (*admitted pro hac vice*)
        Simon E. Fraser (SEF5246)
LibertyView, Suite 600
457 Haddonfield Road
Cherry Hill, New Jersey  08002
(856) 488-7700
*Counsel to the Official Committee of Unsecured Creditors*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Civil Action No. 03-5869 |
| | : | |
| NUTRAQUEST, INC., | : | Related Case: |
| | : | United States Bankruptcy Court |
| Debtor. | : | Chapter 11 Case No. 03-44147 (RTL) |
| | : | |
| | : | |
| In re: | : | |
| | : | |
| NUTRAQUEST, INC. | : | |
| PERSONAL INJURY CASES | : | |
| | : | |
| | : | |
| _____ | : | |

### REPLY TO RESPONSES TO COMMITTEE'S MOTION FOR AN ORDER AUTHORIZING NATALIE D. RAMSEY TO REVEAL THE VALUES OF ALL PERSONAL INJURY CLAIMS TO MEMBERS OF THE OFFICIAL UNSECURED CREDITORS' COMMITTEE

The Official Unsecured Creditors' Committee of Nutraquest, Inc. (the "Committee"),

through its undersigned counsel, replies to the Responses of the Debtor, Robert Chinery, General

Nutrition Corporation, and Stephen Stern (the "Objectors") to the Committee's Motion for Entry

of an Order Authorizing Natalie D. Ramsey to Reveal the Values of All Personal Injury Claims

(the "Values") to Members of the Official Unsecured Creditors' Committee.

2025809v1

**Introduction**

The premises of the Responses are: a) that because all personal injury claimants will allegedly receive 100% payment of their agreed values, the Committee has no function to perform in this bankruptcy case; and b) that the Adversary Action will allegedly become moot as a result of the mediations.  (Debtor's Response, page 4: "the Adversary Action will be rendered moot. . .")  (Robert Chinery's Response, page 2: "But the Adversary Proceeding is nearly moot").  (Stern Response, page 2:  The Adversary Action will be moot "as funding will occur").

These premises are factually and legally incorrect.  The disclosure to the Committee of the values is necessary for the Committee to discharge its statutory obligations, including the prosecution and resolution of the Adversary Action by settlement or by final judgment.

Throughout this Chapter 11 "reorganization" case, the Debtor has consistently lost money, and the originally promised "new" products never materialized.  Moreover, the malefactor behind both the Debtor's liability and its insolvency has retained control over the Debtor and has disabled the Committee from effective participation.

All of the proposed plan funders, including notably the Debtor's principal, have gained extraordinary benefit and stand to gain even greater unique benefits available only in a Chapter 11 case.  Through mediation of the claims and agreement on conditional values, the Defendants: a) have avoided the potential of punitive damages; b) have reduced their cash outlay for defense counsel; c) have capped their liability; and d) have delayed making payment to any of the individuals injured by the Debtor's products.  The Defendants have also been able to pool their resources to allocate liability.  Presumably the Plan that the Debtor will propose will seek to provide all of the Defendants with the protections of an injunction protecting them from suit in

the future by any person claiming to be injured as a result of a Xenadrine product sold by the Debtor.

In short, but for the prospect of full payment of their compromised claims, this case would be an abuse of the Code, the system and this Court.  As the case approaches the plan stage, it is important that the Court permit the Committee to exercise the leverage and its statutory right of checks and balances to ensure that in fact creditors are paid at 100% of their full agreed values.

The Committee's two most significant checks in this bankruptcy case are the Adversary Proceeding and the right to propose a creditors' plan.  In order to put together a creditors' plan, at a minimum the Committee would need to know the amounts of the claims in the case and the funding contributions that would be required.  Similarly, in order to prosecute and/or settle the Adversary Proceeding, the Committee would need to know that same information.  Without this information the Committee is, for all intents and purposes, frozen out of the bankruptcy case.  It is unheard of for a committee, at this late stage of a bankruptcy case, to be completely in the dark about a matter so basic as the claim amounts.

The Committee recognizes that on a number of occasions, the Debtor has promised full payment of all mediated claims.[1] What has not been addressed, however, is the fact that

---

[1] For example, at the June 27, 2005 hearing before the Bankruptcy Court, the following exchange took place:

| Mr. Kimmelman: | Whenever we value a [personal injury] case, the codefendants in that case are committed that subject to confirmation of the debtor's plan of reorganization, that is the amount that will be paid. |
| The Court: | All right.  So everybody is going to get paid in full. |
| Mr. Kimmelman: | Yeah. |

Transcript, p. 18.

Continued…

2025809v1

administrative expenses, including Montgomery, McCracken's contingent fee, must come off the top before any claimants receive payment.[2]  In order for claimants to effectively be paid in "full," they must stand to receive 100% payment *after* all administrative expenses have first been deducted.

Without access to the values and proposed funding amounts, neither the Committee, the creditor body, nor this Court can know whether claimants will be paid in full after satisfaction of all administrative expenses.

Montgomery, McCracken's contingency fee is based on the amount paid by the Adversary defendants.[3]  The Committee believes that the Adversary Action is the driving force behind the Adversary defendants' agreement to fund.  If the Adversary defendants contend that their funding commitments are not made by reason of the claims describedin the Adversary Action, the Committee and MMWR are entitled to discovery and an evidentiary hearing on this issue.  As matters currently stand, the Committee is unable to assess Montgomery, McCracken's

----

….Continued

See, also, Transcript 11/15/05 Hearing (Judge Brown), at p. 6 (Debtor's counsel stated to the effect that Debtor and Plan Funders will fund all claims in full); Transcript 7/6/05 Hearing (Judge Brown), at p. 24 (Debtor's counsel stated, "We intend to fund the claims agreed upon at 100 percent."); Transcript 5/11/05 Hearing (Judge Brown), at p. 31 (Debtor's counsel stated that the adversary defendants "can and will pay" the valued claims); Letter from Debtor's counsel to Judge Brown, 6/17/05, at p. 2 (stating that the adversary defendants have "valued [the mediated claims] with the intention of paying in full . . . .  Increasingly then, the Adversary Proceeding is being rendered moot . . . .").

[2] See Consent Order Pursuant to 11 U.S.C. § 328(a) Authorizing the Employment of Montgomery, McCracken, Walker & Rhoads, LLP As Special Litigation Counsel on a Contingency Fee Basis to Bring Derivative Claims on Behalf of the Debtor's Estate, entered in case 04-44147, 1/11/2005; see also 11 U.S.C. § 507(a)(1) (providing first priority for administrative expenses).  The Committee also notes that the Dechert firm is owed a large sum from Cytodyne, LLC, putting the estate's interests and Dechert's interests at odds unless all creditor claims will be paid in full.

[3] Montgomery McCracken negotiated a mutually acceptable contingency fee agreement with the Committee as part of the Bankruptcy Court's approval for the Committee to commence the Adversary Proceeding.  Subsequently, MMWR on the one hand, and Debtor and Mr. Chinery on the other hand, negotiated substantially reduced contingency fee percentages and other conditions disadvantageous to counsel.  Montgomery McCracken is presently entitled to a 20% contingency of any monies paid to the estate by reason of the claims asserted in the Adversary Proceeding.

-4-

contingency fee or the additional funding required thereby to enable creditors to be paid at the 100% promised by the Debtor and the other defendants.[4]

Because there is a very real risk under the current circumstances that the creditor body will be expected to absorb Montgomery, McCracken's contingency fee, and perhaps other administrative costs, it is crucial that the Committee have access to the completed mediation amounts, and indeed to funding commitments, so that, *inter alia*, it may evaluate an appropriate settlement of the Adversary Proceeding, pursue the Adversary Proceeding to ensure 100% payment of claims, and protect its ability to propose a competing plan.

## I.   The Debtor's promise to pay all claims "in full" does not render the Committee's Adversary Proceeding moot

1.   If the Debtor and the Plan Funders intend for administrative expenses to come out of the claimants' pockets, leaving them ultimately with less than 100%, then the Committee must resume prosecution of its Adversary Proceeding, as well as seek to lift exclusivity[5] and propose a creditors' plan, so that both administrative and prepetition claimants will all be paid 100%.  As the Committee has described a number of times already, the Adversary defendants improperly removed from the estate more than enough funds to pay 100% of what the Committee estimates the total to be of all administrative and prepetition claims.

2.   The Objectors posit that because all personal injury claims are valued and there is a confidential arrangement in place to pay all those values, the estate must cease all efforts to recoup property wrongfully removed.  First, until there is a guarantee that in fact creditors will be

---

[4] Mr. Stern's Response states, "Indeed, it is of no moment where the funding comes from – rather what is important is whether the parties have agreed to the funding."  Stern Response at p. 2.  This statement is false.

[5] While exclusivity is currently in place until February 7, 2006 (by agreement with the Committee), the Committee has the right to seek to lift exclusivity at any time.

**paid** the full amount of their agreed values, the defendants appear to agree that the Adversary Proceeding must continue.

3.      Moreover, there is no law supporting this proposition.  Indeed, blackletter law holds that a bankruptcy estate's recovery actions are not "capped" at the total value of unsecured claims.

4.      "Recovery" for purposes of shepherding back into the estate fraudulently transferred property after avoidance, is governed by 11 U.S.C. section 550(a).  The test is as follows: *property that was the subject of an avoided transaction may be "recovered" into the estate so long as such recovery would be "for the benefit of the estate."*  11 U.S.C. § 550(a).

5.      Although the Objectors have never cited section 550(a), their argument is essentially that in order for property that was the subject of an avoided transaction to be recoverable under section 550(a)'s "benefit to the estate" requirement, the distribution to unsecured creditors must increase as a result, and that if such creditors are already receiving a 100% distribution, recovery could never be a "benefit to the estate."

6.      The Objectors' argument directly contradicts the law on section 550(a)'s "benefit to the estate" test.  Whether unsecured creditors can be paid in full even without recovery is irrelevant.  See Acequia, Inc. v. Clinton (In re Acequia, Inc.), 34 F.3d 800, 811 (9th Cir. 1994) ("Courts have refused to dismiss avoidance actions even though the unsecured creditors had received full distributions under a plan of reorganization."); Mellon Bank v. Dick Corp., 351 F.3d 290, 293 (7th Cir. 2003) (stressing that section 550 does not require any benefit flowing to unsecured creditors); Funding Sys. Asset Mgmt. Corp. v. Chemical Business Credit Corp. (In re Funding Sys. Asset Mgmt. Corp.), 111 B.R. 500, 523 (Bankr. W.D. Pa. 1990) (holding that the

fact that all unsecured creditors would receive a 100% distribution even absent recovery was irrelevant to the question of whether recovery was permitted under section 550(a)).

7.      The question of whether a recovery benefits the estate for purposes of section 550(a) is a different, and much broader, question than whether unsecured creditors will realize a greater dividend as a result of a recovery.  See Stalnaker v. DLC, Ltd., 376 F.3d 819, 823 (8th Cir. 2004) ("[T]he bankruptcy estate is not synonymous with the concept of a pool of assets to be gathered for the sole benefit of unsecured creditors."); Mellon Bank, 351 F.3d at 293 (7th Cir. 2003) ("Lest this way of resolving the issue be taken to assume that § 550(a) requires that some benefit flow to unsecured creditors, we add that the statute does not say this.  Section 550(a) speaks of benefit to *the estate* . . . ."); Acequia, 34 F.3d at 811 ("Courts construe the 'benefit to the estate' requirement broadly, permitting recovery under section 550(a) even in cases where distribution to unsecured creditors is fixed by a plan of reorganization and in no way varies with recovery of avoidable transfers."); Gonzales v. Nabisco Division of Kraft Foods, Inc. (In re Furrs), 294 B.R. 763, 772 (Bankr. D.N.M. 2003) ("[T]he term 'estate' is broader than the term 'creditors.'"); Trans World Airlines, Inc. v. Travellers Int'l (In re Trans World Airlines, Inc.),163 B.R. 964, 972 (Bankr. D. Del. 1994) ("Section 550(a) requires a benefit to the *estate* not to *creditors*.  'Estate' is a broader term than 'creditors.'").

8.      In fact, there is no requirement under section 550(a) that creditors see even one penny of a recovery.  See, e.g., Stalnaker, 376 F.3d at 823-824 (holding that even where all creditors claims' were already settled, recovery still benefited estate); Mellon, 351 F.3d at 293 (holding that section 550(a) does not require "that some benefit flow to unsecured creditors"); Acequia, 34 F.3d at 811 (stating that recovery is permitted even where creditors' recovery "in no way varies with recovery of avoidable transfers");  In re Furrs, 294 B.R. at 772 (rejecting

-7-

argument that "'benefit to the estate' means essentially 'payment to general unsecured creditors.'"); Trans World Airlines, Inc., 163 B.R. at 972 (holding that creditors need not receive any "meaningful and measurable" benefit and that "[t]here is no requirement that an avoidance action recovery be distributed (or 'committed') in whole or in part to creditors.").

9.      The "benefit of the estate" standard is very broad, and is met simply where *"the action increases the value or assets of the estate."* In re Furrs, 294 B.R. at 772 (clarifying that question of "whether unsecured creditors will receive some benefit from the recovery" is "too narrow a definition").  See also Mellon, 351 F.3d at 293 ("§ 550(a) is satisfied by an indirect benefit to the estate, and the point hardly seems arguable even as an original matter.  (There are no decisions to the contrary . . . .)"); Acequia, 34 F.3d at 811 (stating that "[c]ourts construe the 'benefit to the estate' requirement broadly" and noting that courts have found "tenuous 'benefits'" to satisfy section 550(a)); Weaver v. Aquila Energy Marketing Corp., 196 B.R. 945, 157 (S.D. Tex. 1996) ("§ 550's benefit to the estate requirement is satisfied once there is an identifiable benefit."); Funding Sys. Asset Mgmt. Corp., 111 B.R. at 523 (requiring simply that estate assets increase as a result of recovery); 5 Collier on Bankruptcy ¶ 550.02[2] (15th Ed. Rev.) ("If the recovery will have some positive benefit to the estate or its creditors, however, recovery may be had even if such benefit is indirect.").[6]

10.      Courts have found a "benefit to the estate" based on the mere fact that a recovery would increase the debtor's overall financial health and/or would render the debtor all the more

---

[6] The Court will recall that earlier in the Adversary Proceeding, the defendants brought a motion seeking to clarify that the Adversary Proceeding was brought on behalf of the estate.  As conceded by the Adversary Defendants, the estate is the Committee's client, not merely the unsecured creditor body.

able to confirm and fully fund a plan.[7]  See, e.g., Acequia, 34 F.3d at 811 ("The recovery of a preference will be additional security for the fulfillment of the debtor's plan.") (quoting DuVoisin v. East Tenn. Equity, Ltd. (In re Southern Indus. Banking Corp.), 59 B.R. 638, 641 (Bankr. E.D. Tenn. 1986)); Funding Sys. Asset Mgmt. Corp., 111 B.R. at 523-24 ("The relevant standard has been met in this case.  Recovery by Debtor will redound to the benefit of unsecured creditors in that recovery will improve Debtor's 'financial health' by increasing its assets and therewith the likelihood that Debtor will be able to meet its obligations under the Plan.").

11.     Importantly, increased ability to pay administrative costs (and related claims) is a "benefit to the estate".  In Stalnaker, the United States Court of Appeals for the Eighth Circuit upheld the lower court's judgment in favor of the trustee on a fraudulent transfer action.  The transferee argued that the recovery could not have been for the "benefit of the estate" because prior to trial the debtor had settled with all unsecured creditors.  Even though the avoidance had no effect on unsecured creditors' distributions, the court held that the avoidance still satisfied section 550(a)'s standard because it increased the estate's ability to pay administrative costs and fees.

12.     The holding of Stalnaker is particularly relevant to the issue of payment of the contingent fee.  In Stalnaker, the defendants claimed that settlement with all of the unsecured creditors required that the trial of the Adversary Action not go forward.

The court rejected that contention and stated:

> The facts of the present case make clear that the bankruptcy "estate" is not synonymous with the concept of a pool of assets to be gathered for the sole benefit of unsecured creditors.  Here, administrative claims that relate

---

[7] For example, a favorable judgment in the Adversary Action on the substantive consolidation count (Count XIII) would make all of Defendant Robert Chinery's assets available to this estate.

-9-

to over four years of attorneys' fees and expenses and trustee's fees and expenses also exist and are recoverable under 11 U.S.C. § 330(a).  The fact that unsecured creditors settle on the eve of trial does not extinguish the bankruptcy estate as a legal entity, nor does it extinguish other claims on the assets of the estate, such as the administrative claims.  Further, we have no doubt that the trustee's efforts to litigate the matter created [the debtor's] incentive to settle the unsecured claims.  We find no authority for the proposition that a debtor may settle with unsecured creditors on the eve of trial, thereby thwarting professionals in their attempt to collect fees for at least four years of work to administer the bankruptcy estate.  The trustee and his attorneys reasonably pursued the avoidance, it was for the benefit of the estate, and they are entitled to administrative expenses.

Stalnaker, 376 F.3d at 823, 824.  (Emphasis added)

## II.     The Mediation Process is at an end and the Values can no longer remain secret

13.     Contrary to its representations in Court that it will reveal the Values once the mediations are complete, the Debtor seems to have reversed its position and now seeks to conceal the Values indefinitely.

14.     At the June 6, 2005 hearing Mr. Kimmelman stated, "Now, I'm not saying to the Court or to Ms. Ramsey that these numbers are going to be held confidential forever.  They can't be.  She's right.  It's a bankruptcy process.  At some point in time, and relatively quickly, I hope, we can release these numbers, because we – everyone has to know the numbers, because based upon the numbers, people will have an opportunity to vote on the plan.  They vote the amount of their claim, so the claims have to become known."  Transcript, June 6, 2005, at p. 25.

15.     Mr. Kimmelman described his reason for opposing the Committee's learning the Values as follows.  "The problem I have, Your Honor, is that to insure the integrity of the process, we need to know that if we are going to bring the professionals – the retained professionals and Mr. Miceli into this, and we are to disclose this information to them, that it ought not go to those individuals, those plaintiffs and their counsel, who have not yet been in

-10-

2025809v1

mediation and had their cases successfully resolved.  That, in my opinion, will set – will give a severe blow to the mediation process."  Id. at p. 26.

16.     As Mr. Kimmelman informed the Court at the November 15, 2005 status conference, all mediations are effectively completed.  See Transcript, November 15, 2005, at p. 6-7.  The four remaining mediations are unrelated to, and will have no effect on, plan funding. See Id.  The Debtor's reason for keeping the Values from the Committee is now moot.  The Debtor and the Objectors no longer have reason to prevent the Committee from learning the Values.

17.     The Objectors predict calamitous consequences if the Committee is permitted to learn the Values.  See, e.g., GNC's Response at p. 1-2 ("The success of [the mediations] and the ultimate ability to confirm a largely consensual plan of reorganization in Nutraquest's Chapter 11 proceeding has been and continues to be in no small measure due to the confidentiality of the valuations . . . .").  First, the Committee seeks disclosure only to Committee members.  Second, no open mediations remain.  No proceedings exist that could be corrupted by the Committee's knowledge of the Values.  On the contrary, at the plan stage of a bankruptcy case, a Committee needs to know how a proposed plan treats the claims in the case, so that they can know whether claims are treated fairly and uniformly.

18.     In seeking to maintain a veil of secrecy over the amounts of the claims and plan funding, the Debtor seeks, essentially, to unilaterally direct and shape this case and the plan. This autocratic approach is inconsistent with bankruptcy law and policy.  In bankruptcy cases, and especially at the plan stage, the Committee is entitled to know the amounts of the claims, regardless of the process used to obtain those amounts.

-11-

19.    The Debtor's *modus operendi* in this case is to paternalistically assuage the Committee and creditors that all claims will be paid "in full."  The bankruptcy process does not work this way.  Complete transparency is one of the most basic *quid pro quos* required of a debtor in exchange for bankruptcy's extraordinary protections.  The Committee, creditors, Court, and other parties in interest are not required to simply take the Debtor's counsel at his word with respect to fundamental facts material to plan formulation.  The Committee, among other things, is entitled to participate in plan formulation.  This participation, at the very least,  requires that the Committee know the values of all the claims in the case.

**III.    The Committee did not consent to unconditional extension of exclusivity**

20.    The Objectors argue that the Committee has no use for the Values because the Debtor's exclusive period runs through February 7, 2006, and imply that the Committee is acting in bad faith because it consented to extension while at the same time planning to seek the Values.

21.    Importantly, the Committee did not consent to unconditional extension.  The Consent Order represented a compromise.  The Debtor sought six months additional exclusivity.  In agreeing to another four months, the Committee did so "without prejudice to . . . the Committee's right to seek to terminate or limit exclusivity for cause shown."  See Consent Order Pursuant to 11 U.S.C. § 1121(d) Extending the Debtor's Exclusive Periods of Time Within Which to File a Plan of Reorganization and Solicit Acceptance Thereof, at p. 2.[8]

22.    Should the Debtor propose a plan that provides for administrative expenses to be deducted from claimants' recoveries, such conduct would constitute ¨cause¨ to limit or terminate

---

[8] The Debtor's Response states, "The Committee's consent to this extension was unconditional."  Debtor's Response at p. 3.  This statement is false and, given the Order's obvious and plain language, could not have been made in good faith.

-12-

the consented extension.  The Committee would not be doing its job in this case if it did not

monitor the Debtor's and the Funders' actions to ensure that the Debtor keeps its word and all

claimants actually receive 100%.

**V.      A creditors' plan could yield more than the Debtor's yet-to-be proposed plan**

23.      As discussed above, at this point it is entirely possible that a creditors' plan could

yield more than the Debtor's yet-to-be filed plan.  The Debtor is making conclusory statements

about the contents of a plan that does not exist (i.e. the Debtor's inchoate plan) and requiring all

parties in interest to just take it at its word.  Oral representations made by the Debtor's counsel

do not equate to the existence of a plan that unequivocally provides for 100% recovery.

24.      The Objectors refer to a creditors' plan as "fanciful," "an abstraction," "inchoate,"

and "hypothetical."  This language ignores the fact that the Debtor's "100 % payment" plan does

not exist yet either.  The Objectors' adjectives at this point apply equally to both any yet-to-be

proposed debtor's plan and any yet-to-be proposed creditors' plan.

25.      And the Debtor's counsel has made no mention of administrative expenses.

Under any plan proposed by the Committee all creditors would realize 100% recovery after

payment of all administrative expenses.  Such may not be the case under the Debtor's inchoate

plan.

26.      Further, exclusivity expires in about two and half months.  The Debtor has made

no promises that its "100% payment" plan will exist by then.  Once exclusivity expires, it will be

just as likely that a creditors' plan will end up paying all claims in full.

**VI.     The Objectors Misrepresent the Mediation Privilege**

-13-

27.     The Objectors invoke the federal mediation privilege in attempting to keep secret the Values.  This is subterfuge.  This Court's mediation privilege is as follows:

> All information presented to the mediator shall be deemed confidential unless requested otherwise and shall not be disclosed by anyone, including the mediator, without consent, except as necessary to advise the Court of an apparent failure to participate.  The mediator shall not be subject to subpoena by any party.  No statements made or documents prepared for mediation shall be disclosed in any subsequent proceeding or construed as an admission.

D.N.J. Local Rule 301.1(e)(4).

28.     The Committee does not seek any information presented, statements made, or documents introduced during any mediation.  The Committee simply seeks the numerical *result* of each mediation, each of which constitutes a claim in this bankruptcy case.  A ruling that the Committee is not entitled to the Values is essentially a ruling that a Committee is not entitled to know the amounts of the claims in a bankruptcy case.  This the Committee is certainly entitled to do in its role as plan negotiator.

29.     The Objectors' invocation of the mediation privilege is an attempt to obfuscate the simple point that the Committee is trying to learn the amounts of the claims in this bankruptcy case.  Mediation was the means used to arrive at these amounts.  The fact that a process in which communications are deemed confidential was chosen as the means to arrive at the amounts of claims in the bankruptcy case does not mean that the those amounts themselves are and must remain confidential.

## No Brief Required

30.     Pursuant to Local Rule 7.1(d)(4), no brief is required as the issues addressed in this Reply do not involve complex issues of law.

-14-

2025809v1

WHEREFORE, the Official Unsecured Creditors' Committee of Nutraquest, Inc. requests entry of an Order lifting the restriction on Natalie D. Ramsey and authorizing her to disclose to the members of the Committee and their attorneys, along with other attorneys and personnel at Montgomery, McCracken, the aggregate mediated value and the individual case values of all personal injury cases that have competed mediation, under such terms as the Court may reasonably deem appropriate.

MONTGOMERY, MCCRACKEN, WALKER & RHOADS, LLP

Dated: November 28, 2005    By:    /s/ Simon E. Fraser
                                    Natalie D. Ramsey (admitted *pro hac vice*)
                                    John H. Lewis, Jr. (admitted *pro hac vice*)
                                    Simon E. Fraser (SF5246)
                                    Counsel to the Official Unsecured Creditors' Committee

-15-